GUILLERMO ATILES MORÉU, ETC., EX REL., SUSANO CASTRO DEL VALLE, demandante y recurrido, *v.* SAN JUAN TRADING CO., INC., demandado y recurrente; GUILLERMO ATILES MORÉU, ETC., EX REL., SUSANO CASTRO DEL VALLE, demandante y recurrente, *v.* ALCOA STEAMSHIP CO., INC., SAN JUAN TRADING CO., INC., y JAMES NOURSE, LTD., demandados y recurridos.

*Números:* 445, 446        *Resueltos:* 4 de noviembre de 1964

*Luis E. Dubón, Luis E. Dubón, Jr., R. García Cintrón, A. Torres Braschi,* y *R. Ruiz Sánchez,* abogados de San Juan Trading Co., Inc.; *Nachman & Feldstein,* abogados de Susano Castro del Valle; *Hartzeld, Férnández & Novas,* y *Vicente M. Ydrach,* abogados de James Nourse Ltd.

Sala integrada por el Juez Asociado Señor Blanco Lugo como Presidente Accidental de Sala y los Jueces Asociados Señores Dávila y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Susano Castro del Valle trabajaba para un porteador de carga independiente debidamente asegurado con el Fondo

del Seguro del Estado. Fue alcanzado por unos fardos de sacos de yute mientras se dedicaba a labores inherentes a su trabajo. Sufrió graves lesiones. Fue compensado por el Fondo.

Subrogándose en los derechos del obrero, el Administrador del Fondo del Seguro del Estado radicó ante el Tribunal Superior, Sala de San Juan, la acción civil que ahora consideramos. Incluyó como demandados a la San Juan Trading Co., Inc., Alcoa Steamship Co., propietaria del muelle y almacén donde ocurrió el accidente y a James Nourse Ltd., una compañía naviera inglesa propietaria de la motonave "Shahzada" a bordo de la cual llegó a San Juan el cargamento de fardos a que hemos hecho referencia. Fundó su reclamación en la alegada negligencia de San Juan Trading Co. y/o James Nourse Ltd. al formar sus agentes y/o empleados la estiba de donde se desprendieron los fardos y que "dicha estiba fue impropia y negligentemente estibada y reforzada con cuarteles [sic] de madera por las demandadas, sus agentes y/o empleados", lo cual ocasionó el desprendimiento que lesionara al recurrente.

Los demandados en sus contestaciones negaron las alegaciones de negligencia y daños. James Nourse Ltd. y San Juan Trading Co., Inc. entablaron reclamaciones contra copartes responsabilizando el primero a San Juan Trading Co., Inc. y a Alcoa Steamship Co. por los daños ocurridos y alegando la segunda que toda intervención y participación con la referida estiba había sido en su carácter de mandataria de James Nourse y dentro de los límites del mandato sin que mediara imprudencia por lo cual la responsabilidad era imputable al principal Nourse.

Celebrada la vista del caso en sus méritos, por estipulación de las partes, se desestimaron las reclamaciones contra Alcoa Steamship Co. Finalizada la prueba, el tribunal de instancia declaró sin lugar la demanda en cuanto a James Nourse Ltd., desestimó las reclamaciones contra copartes y dictó sentencia condenando a San Juan Trading a pagar al

Fondo del Seguro del Estado $3,477.40 e indemnizó al perjudicado en $25,000 más una suma en honorarios de abogado. Tanto el demandante como San Juan Trading recurrieron ante nos. Decidimos revisar la sentencia.

Apunta la demandada ocho errores. Discutiremos los tres primeros conjuntamente. San Juan Trading alega que constituyó error determinar que la estiba de la cual cayó el fardo que lesionara al demandante estaba formada de manera insegura y negligente; que la condición insegura que dio lugar al accidente fue creada por sus empleados, teniendo San Juan Trading conocimiento de ello; y que el accidente se debió exclusivamente a la negligencia de sus empleados.

La prueba presentada por el demandante para establecer su contención consistió en su propio testimonio y el de su patrono Manuel Castro Molina, dos capataces del muelle y un compañero de trabajo. Castro del Valle declaró en síntesis que para el 9 de marzo de 1955, fecha en que ocurrió el percance, se encontraba empleado como "peón de cargar y descargar" en el camión de Manuel Castro Molina. En la mañana de los sucesos llegó al muelle de la Alcoa en el camión de su patrono junto a otros empleados para tomar una carga de fardos de sacos de yute con destino a la Central Constancia de Toa Baja. Los fardos se encontraban estibados unos sobre otros en columnas de tres o cuatro fardos de altura formando las diferentes columnas una estiba en forma de bloque. Había varias estibas con distinto número de fardos separadas por un corto espacio entre sí. Aunque durante la vista del caso hubo confusión sobre la forma de los referidos fardos, un examen de los exhibits fotográficos admitidos en evidencia y las dimensiones de éstos no dejan duda sobre su forma rectangular y superficie predominantemente plana en toda su extensión. Los sacos de yute estaban protegidos por una manta o cubierta de textura áspera, amarrando la envoltura tres o cuatro flejes de acero para darle mayor solidez al fardo.

El demandante y sus compañeros se dirigieron a una estiba de fardos destinados a la Central Constancia. A unas 18 pulgadas de ésta se hallaba la estiba de donde se desprendieron los fardos que lesionaron al recurrente. Tenía cuatro fardos de altura y estaba destinada a otro consignatario. Cargaron el camión de Castro Molina con fardos de la estiba de Constancia y dieron un viaje a la Central.(¹) Regresaron al muelle ya cerca de mediodía para tomar otra carga de fardos de la misma estiba. Sólo restaban los fardos de la primera camada. En ausencia de Castro Molina otro porteador público, llamado Juan Gay había tomado otra carga de fardos de la misma estiba.

Comenzaron nuevamente a cargar fardos en el camión. El demandante se encontraba de espaldas a la estiba del lado atando un cabo a la plataforma de éste. No se fijó en la estiba "no teníamos motivo porque no era de nosotros". Oyó un grito de "¡Cuidado! que no me dio tiempo para nada" seguido de un golpe en la cadera izquierda que le tumbó al pavimento del almacén quedando pillado por uno de dos fardos que se desprendieron súbitamente del costado de la estiba vecina.

El demandante admite que su experiencia manipulando carga como empleado de Castro Molina consistió en el transporte de periódicos, artículos de ferretería, varillas y otra carga miscelánea, no siendo hasta el día del accidente en que por primera vez "trabajaba con esos bultos". Asegura, sin embargo haber visto "allá en la Central" estibas de fardos hechas en forma tal que los bultos quedan "contrapeados", quedando así cada pie o nivel de marcancía entrelazado con el nivel anterior.

El testimonio del carrero Manuel Castro Molina fue más explícito en lo que concierne a la manera que el demandante

---

(¹) La declaración del accidentado y los conduces firmados por Castro Molina y que aparecen en el Exhibit A de la recurrente, dejan establecido que éste tomó dos cargamentos de fardos de la estiba de Constancia durante el día de los hechos.

entiende ser la "correcta" de estibar fardos de sacos. Estaba presente cuando ocurrió el accidente que lesionara al demandante. Habían cargado unos fardos que "tenían un promedio de más de 30 pulgadas cuadradas". El testigo se encontraba esperando un fardo "que ellos están empujando por debajo; veo que viene un fardo que se desprendía de la estiba de al lado . . . grité, los muchachos volaron; pero Susano no pudo escapar y quedó pillado".

Al igual que Castro del Valle las observaciones del testigo sobre "la mejor forma" de construir estibas se limitan a las observaciones que arguye hizo sobre la forma de estibar fardos de sacos "allá en la Central". Admite que todos los fardos que había en el muelle de la Alcoa estaban estibados "unos sobre otros" mientras que en la Central éstos se estiban "amarrados" o en forma de pirámide. Indicó que mediante este método de estibar se reduce el número de fardos en los distintos niveles de la estiba para que cada bulto descanse sobre la separación existente entre los dos fardos inferiores. Señala que "nosotros lo hacemos en esa forma, porque esas estibas casi siempre se abren . . . después que tienen mucho de alto". Contrainterrogado por la recurrente dijo haber observado una inclinación en la estiba de donde cayó el fardo "no estaba completamente recta . . . la diferencia se notaba arriba". El capataz Serafín Esteban, testigo del recurrido, declaró que en el muelle donde trabajó amarraba estibas muy altas ya que entendían que la vibración del muelle debido al tránsito de camiones podía tumbar la carga. No obstante los fardos se estiban unos sobre otros cuando no son numerosos. Repreguntado afirmó que nunca ha visto desplomarse una estiba de fardos. Por último Ramón Dones compañero de trabajo del recurrido afirmó que con posterioridad al desprendimento notó unos cuartones de madera que sostenía la estiba por detrás.

La prueba presentada por la recurrente negó las afirmaciones de negligencia en la preparación de las estibas. Pre-

sentó peritos en la preparación de estibas de carga naviera. Además declararon sus empleados y supervisores sobre la seguridad y fortaleza que ofrecen estibas construidas fardo sobre fardo. Señala que es éste el método correcto de levantar estibas conforme a las mejores prácticas de estibar predominantes en la industria. Quedó establecido que la recurrente importó durante 16 años el 95% de los fardos de sacos de yute que se introdujeron en Puerto Rico con anterioridad al comienzo de embarques al granel. Siempre se estibaron unos sobre otros en estibas cuadradas o rectangulares sin que ocurrieran percances. Así también se estibaron los fardos que se descargaron de la motonave Shahzada, asegurando los capataces que intervinieron en la descarga del navío que las estibas después de hechas son completamente seguras. A ese efecto declararon Candelario Parot y Rodolfo de Jesús quienes presenciaron la construcción de las estibas de los fardos en cuestión. A la fecha del accidente Parot ocupaba la posición de superintendente de muelle de la recurrente, supervisando los capataces en la carga y descarga de los fardos que llegaban consignados a la recurrente.

Construían las estibas utilizando el equipo mecánico conocido por *"fingerlifts"* para elevar los fardos a la posición correspondiente mientras se va construyendo la estiba.(²) Declara que observó cuando los empleados de Castro Molina cargaban los fardos al camión "no con el 'fingerlift' sino con la mano . . . para eso tienen que usar una barra de hierro para [des]pegar un fardo de otro". Señaló que no es éste el "medio seguro" de colocar y descargar fardos de las estibas pues "el fardo después que se despega de la estiba como tiene un peso de media tonelada no hay quien lo controle, lo mismo coge para acá que para allá. No tiene control". Siempre ha

---

(²) La recurrente presentó prueba demostrativa de que alquiló el uso de *"fingerlifts"* para descargar y estibar los fardos que perjudicaron al demandante. El testigo Parot declaró que en "la Alcoa" ofrecían este equipo a quien lo solicitara. Castro Molina no lo utilizó, como tampoco lo hizo el carrero Juan Gay.

estibado los fardos uno sobre el otro. Nunca los ha visto de otra manera. Insiste que en todos los muelles se usa el mismo sistema de hacer estibas ya que la superficie, peso y tamaño del fardo hace innecesario que se coloquen amarrados o entrelazados. Aseguró que luego de hechas las estibas ". . . el fardo no se puede desprender nunca . . . de ninguna manera la estiba esa no es movible".

La declaración del perito de la recurrente, capitán Francis Crocco ratificó en lo esencial lo ya expuesto por Candelario Parot. Como capitán de navíos y superintendente de terminales de la Puerto Rico Line declaró estar familiarizado con los distintos métodos de estibar carga naviera incluyendo fardos de sacos de yute. Identificó los exhibits fotográficos del demandado como "un buen ejemplo de la manera en que se estiban [fardos] en los muelles . . . uno encima del otro". Nunca los ha visto cruzados o entrelazados. Añadió además el perito que en toda su experiencia tampoco ha observado un fardo caerse por sí solo del centro de una estiba. Repreguntado por el abogado del demandante recalcó que estibas construidas fardo sobre fardo no necesitan el soporte de estacas aunque señaló que si de hecho habían estacas eso "indicaba algo". En su opinión sólo los casos "bandos" que tienen tendencia a resbalar o a rodarse se estiban amarrados o entrelazados. Tomó como ejemplo los casos de arroz cuya porosidad permite que el polvo que tiene el grano salga a la superficie del caso tornándose éste resbaladizo por lo cual es buena idea siempre "cuando se pueda, amarrar los sacos".

Por último prestaron declaraciones los testigos Ramiro Ortiz, Rodolfo de Jesús y Juan L. Casellas. El primero declaró haber visto numerosas estibas de fardos como inspector de aduanas en los muelles. Todos se estibaron como se señala en las fotografías a que hemos hecho referencia. Nunca vio estibas trabadas o entrelazadas. El capataz de Jesús fue quien construyó la estiba de autos. Negó que requiriese ser apuntalada con estacas o cuartones ya que el tamaño y peso de los

bultos uno encima del otro es suficiente para estabilizar la carga de fardos. Tampoco ha visto fardos trabados o amarrados. Casellas ha sido empleado y gerente del departamento de navíos de la recurrente. Siempre vio los fardos estibados uno sobre otro en la forma señalada anteriormente.

No hay controversia en cuanto a la forma como estaban estibados los fardos. El tribunal de instancia concluyó que la demandada incurrió en negligencia al no entrelazar los fardos en la construcción de las estibas. Esta conclusión la basó en las opiniones formuladas por los testigos del demandante. La demandada, como hemos vito, presentó prueba pericial para demostrar que la estiba estaba construida en la forma usual y corriente. Y que se ha demostrado por la experiencia que es una forma segura de hacerlo. Aquí no está envuelta, pues, una cuestión de credibilidad. Es simplemente una cuestión de aquilatar la prueba presentada. Luego de considerar los hechos y la prueba pericial presentada estamos convencidos que de no mediar intervención ajena o causas extrañas era físicamente improbable que los fardos pudieran desprenderse por sí solos de una estiba construida como acostumbraba hacerlo la demandante. Señalamos anteriormente la forma en que estaban construidas las referidas estibas, o sea, en columnas de cuatro fardos de altura formando una estiba a manera de bloque. Cada bulto pesa en exceso de media tonelada, de superficie plana en toda su extensión y su base de unas 24 pulgadas de ancho descansa paralelamente sobre la superficie del fardo anterior. Su solidez es indisputable. No contiene en su interior mercancía susceptible de alterar la forma, superficie o posición del fardo al ser éste sometido al peso y presión de los bultos circundantes. Ciertamente la manta o envoltura áspera que cubría la superficie del fardo no puede ni remotamente calificarse de resbaladiza. Por el contrario tenía que necesariamente establecer fricción entre los costados de uno y otro fardo contribuyendo así a una mayor estabilidad en la estiba. ¿Cómo es posible entonces

que por sí solo se desprenda un fardo que responda a la descripción antes expuesta, de una columna de cuatro bultos cuyo peso combinado es en exceso de dos toneladas? No obstante el recurrido nos apunta que es ésta una forma peligrosa e insegura de estibar. Afirma que la evidencia demostró que la medida de un fardo es proporcionalmente igual a la de un caso de azúcar, o sea, un poco menos del doble del ancho, y que el propio testigo de la recurrente Candelario Parot declaró que las estibas de sacos de azúcar y habichuelas se levantan "amarradas". La razón para amarrar estas estibas es obvia. Como apunta el perito Crocco y expresamente admitió el testigo Castro Molina, (3) su contenido blando y superficie irregular hace necesario que se crucen o entrelacen los distintos niveles ya que el peso de la estiba hace que los sacos puedan resbalarse o cambiar de posición.

En realidad la única prueba presentada por el recurrente para sostener su tesis consistió del testimonio de Castro Molina y Serafín Esteban. El primero sólo ha visto entrelazados o amarrados los fardos que entregaba a la Central Constancia. Tiene unos 32 años de experiencia transportando carga en los muelles y aunque afirmó que "esas estibas casi siempre se abren" no hizo mención de lugar u ocasión alguna en que hubiese observado un desprendimiento de fardos como el de autos o se estibaran éstos en la forma que alega usaban en la Central Constancia. El segundo se limitó a señalar que la vibración del muelle en que trabajaba, debido al tránsito de camiones, hacía que se levantaran las estibas amarradas cuando tenía 10 ó 15 pies de altura. Estibas más pequeñas se formaban como lo hacía la recurrente. Cabe apuntar

---

(3) "P ¿Usted está familiarizado con la forma de estibar azúcar en sacos?

"R Bueno, sí.

"P ¿Que se amarran las estibas?

"R Sí, señor.

"P ¿Es o no es cierto que se amarran las estibas porque los sacos son muy blandos e irregulares?

"R Sí, señor."

sin embargo que no hubo prueba al efecto de que el muelle donde se estibaron los fardos de la recurrente estuviese afectado por la condición peculiar que señala la recurrente. Ciertamente no podemos ignorar la realidad que representan 16 años estibando fardos unos sobre otros sin que hasta la fecha del accidente ocurriera ningún percance. Obsérvese además que ni uno solo de los testigos y peritos que prestaron testimonio afirmó haber visto anteriormente desplomarse por sí sola una estiba de fardos levantada fardo sobre fardo. Hemos reseñado la experiencia de los peritos Parot, de Jesús y el capitán Crocco en lo que concierne a estibar fardos y otra carga marítima. Parot ha trabajado supervisando la descarga y estiba de estos fardos desde que comenzaron a importarse a razón de 27,500 fardos por año. De Jesús ha trabajado exclusivamente en fardos desde 1948. El testigo Crocco en el curso de su experiencia como capitán de barco y supervisor de terminales ha tenido ocasión de observar y estibar fardos de sacos en innumerables ocasiones. Su competencia sobre estos extremos es indudable. Todos apuntan las razones que ya hemos esbozado para demostrar que físicamente la caída no pudo haber ocurrido sin que alguna fuerza extraña moviera los fardos después de haber sido estibados como solía hacerlo la recurrente. Estamos contestes con su opinión pues entendemos que la preponderancia de la prueba pericial confiable que tuvo ante sí el tribunal estableció que la manera de levantar estibas utilizada por la recurrente era la más usual y segura para esta clase de bultos.

Surge entonces que la causa próxima del accidente tuvo que haberse manifestado como consecuencia de la intervención de alguien en la estiba de donde cayeron los fardos entre el momento en que los empleados de la recurrente levantaron dicha estiba y el momento del accidente. Y a estos efectos es revelador apuntar la forma en que los empleados de Castro Molina cargaron los fardos de la estiba de Constancia a sus respectivos camiones. No teniendo equipo mecánico especia-

lizado para manejar esta carga, se subían a la estiba separando los fardos con un gancho y empujándolos hasta hacerlos caer a la plataforma del camión. Castro del Valle declaró que utilizaban "una palanquita relativamente corta; pero con más fuerza que uno" la cual metían en una "endija" entre los fardos, hacían fuerza contra la palanca desalojando el fardo y lo dejaban caer a la plataforma. (4) Según Castro Molina "usamos ganchos para halar [los fardos] y tres hombres atrás empujando lo ibamos virando y volteando hasta

---

(4) "P ¿ Entonces los cinco le metían el pecho a un fardo de ésos y lo ponían en el truck?

"R Con alguna maña.

"P ¿ Qué maña usaban?

"R Ibamos acercando poco a poco y después poníamos la parte de arriba; entre todos les metíamos manos y tratábamos de meter más de la mitad en el truck.

"P ¿ Eso lo hacían con los que estaban en el piso, y los que estaban encaramados?

"R Usábamos una palanquita.

"P ¿ Cómo es esa palanquita?

"R Relativamente corta; pero con más fuerza que uno.

"P ¿ Usted me quiere decir que con una palanquita corta movían un fardo de 10 quintales?

"R Sí, señor.

"P ¿ Cómo lo hacían?

"R Se metía dentro de la endija de los dos bordes; se hace un poquito de fuerza para poder meter los dedos . . .

"P ¿ Y mientras tanto dónde está parado el que está palanqueando?

"R Se ha separado de uno de los fardos.

"P Olvídese que no se ha sacado ninguno, hay una estiba de cinco fardos que llega hasta arriba . . .

"R Perdone, Licenciado. Yo dije que había una estiba de cinco o seis fardos. Se va a palanquear uno de la parte de arriba, pues se para uno en el fardo de al lado y palanquea hacia afuera.

"P Entonces se para en uno de la estiba y desde esa estiba empieza a palanquear?

"R Correcto. No se necesita palanquear mucho, con sólo uno meter la palanca y meter la mano es suficiente . . .

"P ¿ Pero me quiere decir a mí y a la Corte entonces, que después que hacían espacio para bajar con las manos entre los cuatro lo bajaban a pulso?

"R No, porque siempre que empezábamos a cargar pegábamos la plataforma del truck a la estiba. Despegábamos, empujábamos y caía a la plataforma."

ponerlos en su sitio y así echábamos los quince fardos . . .
al truck en esa forma". Si recordamos que sólo existían unas
18 pulgadas de separación entre ambas estibas surge enton-
ces la verdadera posibilidad de que los obreros de Castro
Molina, o Juan Gay que también carecía de *"fingerlifts"*,
tuvieron en alguna forma que hacer fuerza contra la estiba
vecina o descansar en ésta al desalojar los fardos, con el
resultado que debilitaron la columna de fardos de la estiba
vecina. Posteriormente las sacudidas causadas por el trabajo
que realizaron el recurrido y sus compañeros al subir al
camión la línea de fardos que cargaron en el segundo
viaje pudo causar que se desalojaran éstos causándole lesio-
nes al recurrido.

Finalmente se nos señala que las declaraciones prestadas
por los testigos Ramón Dones y Castro Molina demostraron
que la estiba causante del daño estaba inclinada y sostenida
con estacas por detrás. Pero es que ya Castro Molina en el
examen directo y posteriormente en la repregunta había
negado que hubiese visto anormalidades en la estiba vecina,
afirmando a su vez que sólo notó que estaba "a 4 de alto y que
no estaba amarrada". (⁵) Y es razonable pensar que así fue
pues cómo entonces explicarse que permitiera a sus emplea-
dos trabajar allí exponiéndose al grave peligro que supone la

(⁵)"P ¿Y después que cayeron los fardos usted miró a la estiba de
donde había caído?
"R Sí. señor.
"P ¿Notó usted algo en relación a esa estiba?
"R Noté una falla en la estiba.
"P ¿Cómo estaban. don Manuel, estibados esos fardos?
"R Esos fardos estaban estibados unos sobre otros a 4 de altura.
. . . . . . . .
"P ¿Usted notó algo en la estiba esa del lado cuando empezó a
descargarla ese día?
"R En la estiba del lado yo no noté nada, porque yo no la iba a
recoger, pues lo único que hice fue ponerme a cargar la que yo estaba
cargando.
"P ¿De modo que usted no vio nada anormal ni distinto en ninguna
estiba?
"R Yo sólo ví que estaba a 4 de alto y que no estaba amarrada."

caída de estos fardos. Más aún, si entendía que la estiba era defectuosa y ofrecía peligro por qué no dio aviso sobre esa condición a la recurrente. La razón es patente. El testigo no vio nada anormal en esa estiba como estaba originalmente levantada temprano en la mañana en que ocurrió el accidente. La inclinación en la estiba, si alguna, tuvo que manifestarse como consecuencia de la intervención de los obreros de Castro Molina y Juan Gay en la descarga de los fardos de la estiba de Constancia, y que dio motivo a la caída de los fardos de la estiba contigua.

Por lo tanto no podemos de lo expuesto concluir que San Juan Trading Co. fue negligente al estibar los fardos en la forma que lo hizo. Necesariamente otras fuerzas intervinieron de las cuales no se le puede hacer responsable.

En vista de la conclusión a que hemos llegado se hace innecesario considerar el recurso interpuesto por la parte demandante.

*Procede revocar la sentencia y dictar otra declarando sin lugar la demanda.*